## DESERET LIVE STOCK CO. v. HOOPPIANIA et al.

No. 4194.   Decided May 29, 1925.   Time to file Application for
    Rehearing Expired September 1, 1925.   (239 P. 479.)

1. WATERS AND WATER COURSES—RIGHT TO WATERS HELD LOST
    BY FAILURE TO USE.  Right of plaintiffs to use waters from
    springs by appropriation and use prior to 1910 *held* under evi-
    dence, and in view of Comp. Laws 1917, § 3468, to have been
    lost by failure to use for seven years.[1]

2. WATERS AND WATER COURSES—APPLICATION TO BENEFICIAL USE
    ESSENTIAL TO "APPROPRIATION OF WATER."  Mere act of filing
    application in state engineer's office under Laws 1919, c. 67,
    § 42, is not "appropriation of water," appropriation not being
    complete until water has been actually applied to beneficial
    use.

3. WATERS AND WATER COURSES—METHOD OF ACQUIRING RIGHTS
    LIMITED TO METHOD PRESCRIBED IN STATUTE.  Method of acquir-
    ing any rights to unappropriated waters of state is limited to
    method or means prescribed in Laws 1919, c. 67, § 41, formerly
    Laws 1903, c. 100, § 34.

4. EVIDENCE—COMMON KNOWLEDGE THAT MANY CONTROVERSIES
    AROSE PRIOR TO ACT OF 1903 AS TO DATES OF APPROPRIATION OF
    STATE WATERS.  It is matter of common knowledge in Utah
    that many controversies arose between claimants prior to
    Laws 1903, c. 100, respecting dates of appropriation of differ-
    ent claimants of state waters.

5. WATERS AND WATER COURSES—PERCOLATING WATERS ON PRIVATE
    LANDS NOT SUBJECT TO APPROPRIATION.  Where waters from
    springs were insufficient to run into or create a natural chan-
    nel, they were percolating waters, and if springs were located
    on private lands, waters arising therefrom were not subject
    to appropriation.[2]
    STRAUP and FRICK, JJ., dissenting.

---

[1] *Promontory Ranch Co.* v. *Argile*, 28 Utah, 398, 79 P. 47; *Gill*
v. *Malcn*, 29 Utah, 431, 82 P. 471.

[2] *Stookey* v. *Green*, 53 Utah 311, 178 P. 586; *Peterson* v. *Eureka
Hill M. Co.*, 53 Utah, 70, 176 P. 729; *Willow Creek Irr. Co.* v. *Michael-
son*, 21 Utah, 248, 60 P. 943, 51 L. R. A. 280; 81 Am. St. Rep. 687.

Headnote 1.   40 Cyc. p. 727.
Headnote 2.   40 Cyc. p. 712.
Headnote 3.   40 Cyc. p. 713.
Headnote 4.   23 C. J. p. 122 (Anno).
Headnote 5.   40 Cyc. pp. 704, 705.

Appeal from District Court, Third District, Tooele County; *A. R. Barnes,* Judge.

Action by the Deseret Live Stock Company against Conie Hooppiania and another. Decree for defendants, and plaintiff appeals.

REMANDED, with directions.

*Young, Boyle & Moyle,* of Salt Lake City, for appellant.

*P. C. Evans,* Salt Lake City, for respondents.

GIDEON, C. J.

The controversy here relates to the right to the use of the waters of a number of springs in Tooele county. The prayer of the complaint is that plaintiff (appellant) be decreed to be the owner of the springs and the waters arising therefrom, and that defendants (respondents) be decreed to own no rights or interests in said springs or their waters. From a judgment decreeing respondents to be entitled to the right to use the waters of certain of the springs during each irrigation season, and the right to use the waters of two additional springs for a part of each such season, this appeal is prosecuted.

The following map will enable the reader to more readily understand the trial court's findings, and will aid in explaining the questions discussed in this opinion:

Appellant owns and cultivates a large acreage of land lying along the western border of the map. The only water supply for irrigating its lands is the water collected from small streams having their sources in the mountains lying east of the channels constructed for the purpose of collecting the water from those streams. Respondent Hooppiania has a homestead claim, as indicated on the map. There is a general slope from the sources of the water running westward at places quite abrupt. The land lying between the foothills of the mountains and the premises irrigated by appellant is arid, and by some of the witnesses described as rocky and not suitable for cultivation. Cedar Knoll, shown on the map, is a small hill or knoll slightly higher than the land about it. The natural channel of the waters of all the creeks north of the spillway runs north of Cedar Knoll. The natural channel of the waters of the streams and springs south of the

spillway is south of the knoll. This south natural channel is designated Big Pole creek. These natural channels, prior to the construction of the artificial flumes or ditches, carried all of the waters from the watershed on the east to the lands of appellant. All of the springs in controversy, except springs No. 11 and No. 12—designated by respondents as Holy Cross springs—are located north of Cedar Knoll and west of the north intercepting channel. All of the springs in controversy are also north of the main east and west channel or canal. This east and west channel is designated on the map as the main channel.

The findings of the court are lengthy, and we shall here state in general terms only such parts of the findings as we conceive to be necessary to explain and for an understanding of the two contested questions argued on this appeal.

The court found that appellant's predecessors in interest, long prior to 1897, actually appropriated all of the water arising from the said creeks and springs by diverting it from these natural channels (including such part of the waters of the springs in controversy as found their way into the natural channel), and used the water for irrigation, stock-watering and culinary purposes. The court further found that since the original appropriation of the waters of these various springs and streams such waters have been used by appellant and its predecessor in interest for beneficial purposes; that during the year 1908, to better conserve the water so appropriated, the predecessor of appellant commenced the construction of a system of concrete channels to intercept the waters of the creeks and springs on both the north and the south sides of the main canal, and thereby convey the said waters so intercepted and collected to and upon the land of appellant; that the said system was completed in about 1910, and as completed was composed of three principal parts, namely, the north intercepting channel, the south intercepting channel, and the main or east and west channel; that the waters from the intercepting channels ran into the main channel, and through that channel to appellant's land; that

the intercepting channels are east of and on higher ground than the springs in controversy; that the waters of the springs in controversy, with the exception of the waters from springs No. 11 and No. 12, as hereinbefore explained, have at no time been carried into the channels of the concrete system; that at no time since the completion of the concrete system have the waters of any of such springs reached, either through the concrete system or the natural channel, the land of appellant except the waters of springs No. 11 and No. 12 during the high-water season; that at the time of the construction of said canal system and prior thereto, the predecessor in interest of plaintiff had acquired a vested right to the exclusive use of the waters of the said springs and the waters running in the streams from the east; that at no time since the completion of the concrete canal system have the waters of springs numbered 1 to 10 inclusive, mentioned in the complaint, been used by the said precedessor in interest of appellant or by appellant in the irrigation of its land, or otherwise put to a beneficial use; that the waters of springs No. 11 and No. 12 were not used by appellant or its predecessor in interest for irrigation or other beneficial purpose except during the high-water season of each and every year; that after the construction of the canal system appellant and its predecessor in interest retained or had a vested right to the use of the waters of springs No. 11 and No. 12 during high-water seasons; that the concrete channels did not carry all of the waters of said creeks during parts of the high-water seasons of each year; that during the period of high water of each year after 1910 and up to the present time a large portion of the waters from said creeks, approximately one-third to one-half thereof, was turned out of the north and the south intercepting channels over a spillway located at the intersection of said north intercepting channel with the said main channel, and from said spillway such waters have been permitted to and did run into the natural channel of Big Pole creek, and through that channel were carried to the land of appellant, and during such high-water periods such waters were used for irrigation, stock-watering, and culinary

purposes by appellant and its predecessor in interest; that the high-water season extends from the middle of April to the 1st day of July of each and every year; that the waters of springs No. 11 and No. 12 have, since the year 1910, during the high-water seasons, run down the natural channel of said Big Pole creek, and, together with the waters running over the spillway, been used by appellant; that none of the waters from the other sources of supply have run down the natural channels since the construction of the canal system; that the waters collected from the other creeks have been collected by the intercepting channels, and have been permitted to run either down the concrete channel running east and west or over the spillway and down the natural channel of Big Pole creek; that the respondent Hooppiania, in the early part of March, 1918, by means of dams and ditches constructed by him, diverted and conveyed to the lands of his homestead the waters of springs No. 11 and No. 12, and thereafter, in the year 1918, except as interfered with by appellant, has diverted and carried to the lands of his homestead all the waters of said springs No. 11 and No. 12, and during the irrigation season of each year has used the same for the purpose of irrigating approximately three acres of land within his said homestead; that on or about the 16th day of April, 1918, appellant constructed a ditch by which the waters of springs No. 11 and No. 12 were diverted from the natural channel of Big Pole creek and carried into the main east and west concrete channel; that until the commencement of this action in May, 1918, the waters of said springs were intermittently diverted and conveyed by appellant into the main concrete channel, but were repeatedly turned back into the natural channel of Big Pole creek bv respondent Hooppiania, and thence into his said ditch; that in the early part of March, 1918, respondent Hooppiania, by means of ditches dug by him, diverted the waters of certain other springs, enumerated in the court's findings and in the decree, and applied the same to lands within his homestead, and ever since has diverted the waters of such springs and conveyed them upon his lands during the irrigation seasons;

that on the 25th day of April, 1918, the appellant filed its application in the office of the state engineer of the state of Utah for the appropriation of the waters of the several unnamed springs or seeps, designated in plaintiff's complaint and in the court's findings, from the 1st day of January to the 31st day of December of each year, said waters to be used upon the lands of appellant hereinbefore referred to; that on the 3d day of May, 1918, and again on the 22d day of May, 1918, respondent Hooppiania filed applications in the office of the state engineer of the state of Utah to appropriate the waters of the various springs in controversy.

There are other findings, but the foregoing are sufficient, in our judgment, for an understanding of the questions determined in this opinion.

The assignments of error assail many, if not all, of the court's findings. The findings are not only supported by substantial competent evidence, but they also reflect the great weight of the evidence on controverted questions of fact. There is, however, no serious conflict on the issues which, in our judgment, must be conclusive of the rights of the parties.

It is very doubtful whether much or any of the water of the springs, other than springs No. 11 and No. 12 ever found its way into any natural channel, but it is conceded that whatever water from those springs did find its way into either of the natural channels had been appropriated and applied to a beneficial use by the predecessor in interest of appellant.

Two questions are presented and argued on this appeal: (1) Had appellant lost whatever right it or its predecessor in interest had to the use of the waters of the springs by failing to use the same from 1910 to 1918? (2) If so, was the method adopted by respondent Hooppiania to appropriate the said waters such as can be recognized and upheld by this court against the application of appellant to appropriate the waters in April, 1918?

It is strongly argued by appellant that the trial court erred in finding or concluding that there had been an abandonment of appellant's right to use the waters of the various

springs, and that there was no evidence upon which the court could make a finding that there had been an abandonment of such right. The statute of our state, Comp. Laws Utah 1917, § 3468, provides:

"When the appropriator or his successor * * * abandons or ceases to use water for a period of seven years, the right ceases, and thereupon such water reverts to the public, and may again be appropriated, as provided in this title; but questions of abandonment shall be questions of fact, and shall be determined as are other questions of fact."

By express language of the foregoing statute there are two methods or means by which one entitled to the use of waters in the state may lose such right: (1) By abandonment; and (2) by ceasing to use the same for a period of seven years. The authorities cited to the effect that time alone is not conclusive of abandonment are neither controlling nor applicable under the findings of the trial court in this case. The testimony is conclusive, and there is no substantial testimony to the contrary, that both appellant and its predecessor in interest had failed to apply any of the waters of those springs to a beneficial use, except springs No. 11 and No. 12, from 1910 to 1918.

As has been frequently stated by the courts, water is the very life blood of the agricultural and stock-raising industries of the arid west. The state is therefore vitally interested in seeing that none of the waters are allowed to run to waste or go without being applied to a beneficial use for any great number of years. The Legislature has provided that a failure to use water for seven years works a loss of the right of the former appropriator to its use, and leaves the water open to reappropriation. We need not discuss or consider the authorities cited by appellant as to the different elements that go to make up or constitute abandonment. Those authorities all agree that time is not necessarily a controlling element; that the intent of the parties should be considered, and, to a very large extent, control in determining whether or not there has been an abandonment.

In support of its argument that the evidence in this case fails to show abandonment, appellant cites two former opin-

ions of this court: *Promontory Ranch Co.* v. *Argile,* 28 Utah,
398, 79 P. 47; *Gill* v. *Malan,* 29 Utah, 431, 82 P. 471. The
court in those cases, as the opinions clearly indicate, was con-
sidering abandonment of waters and not cessation of use or
forfeiture. In 1 Wiel, Water Rights in the Western States,
§ 576, referring to those two Utah cases, it is said:

"So far as this section [Comp. Laws Utah 1917, § 3468] has
been before the court, the court has always considered it from
the view of intention and abandonment, not of forfeiture."

The Supreme Court of California, in considering a statute
similar to our section 3468, supra, distinguishes between non-
user and abandonment. *Smith* v. *Hawkins,* 110 Cal. 122, 42
P. 453. The same case was again before that court (120 Cal.
86, 52 P. 139). A discussion of the question here under con-
sideration will be found beginning at section 574, Wiel, supra.
See, also, 2 Kinney, Irrigation and Water Rights (2d Ed.)
§ 1118. The facts in *Smith* v. *Hawkins,* supra, are in many
respects similar to the facts in this case. The conclusion of
the court was that failure to use for a period of five years
loses or forfeits the prior appropriator's right to the
use of the water. The statute of California does not,
as does ours, specify the number of years of nonuser
required to work a forfeiture, but the Supreme Court of that
state in the Hawkins Case determined five years, and fixed
that time by analogy to the statute under which a prescriptive
title is or may be acquired. Our statute fixes the time at
seven years.

We are of the opinion, and so hold, that whatever right
the appellant had to the use of these waters by appropriation
and use prior to 1910 was lost by failure to use it for seven
years.

Passing now to a consideration of the second proposition
argued: It stands undisputed that appellant filed an applica-
tion to appropriate the waters of these several springs in the
state engineer's office on April 25, 1918. It also appears un-
disputed that two applications for the appropriation of the
waters of the same springs were filed in the state engineer's
office by respondent Hooppiania on May 3, and on May 22,

1918, respectively. The trial court found that prior to April 25, 1918, Hooppiania had, by means of canals and ditches, actually diverted the waters of springs No. 11 and No. 12 also known as Holy Cross springs, and the waters from springs No. 1, No. 2, and No. 3, also designated as Conie springs, and spring No. 7, known as Wild Rose spring, and had conveyed the waters of those springs by means of such canals and ditches to the lands of his homestead and applied the same to a beneficial use. The question is therefore clearly presented whether the actual diversion of water prior to making an application to the state engineer gives to the party making the diversion a right superior to another who first files his application in the state engineer's office.

Chapter 67, Laws Utah 1919, relates to water and water rights. The act is designated as ''An act defining general provisions concerning water and water rights, the appropriation, administration,'' etc., and amends some prior laws. Section 41 of that chapter, so far as material here, provides:

"Rights to the use of the unappropriated public water in the state may be acquired by appropriation, in the manner hereinafter provided, *and not otherwise*." (Italics ours.)

The section further provides that the appropriation must be for a beneficial purpose, and that as between two appropriators the one first in time shall be first in right. The section following that (42) provides that any one entitled to appropriate the unappropriated public waters of the state ''shall, before commencing the construction, enlargement or extension of any ditch, canal, or other distributing works, or performing similar work tending to acquire the said right of appropriation, make an application in writing to the state engineer.'' The language of section 41, supra, is apparently susceptible of but one construction, especially when considered in connection with the following sections of the act, and with the purpose sought to be accomplished by the legislation. It is, however, vigorously contended by counsel for appellant, as I understand their argument, that the method of appropriation prescribed by the statute is not exclusive; that the mere filing of the application in the state engineer's office

is not, in and of itself, an appropriation of water; that an appropriation of water is made by the actual diversion of the water from its natural source and its application to some beneficial use, and that when that is done there is a completed appropriation, and that until such actual application is made there is no appropriation. The court found that respondent Hooppiania had, prior to April 25, 1918, actually diverted and carried this water to his homestead and applied it to a beneficial use. It is therefore contended, based upon that finding, that the respondent is entitled to a reasonable time thereafter in which to make application to the state engineer for an order allowing or approving the appropriation theretofore made. It may be conceded, and we think no one will contend to the contrary, that the mere act of filing    2 an application in the state engineer's office is not an appropriation of water; that the appropriation is not complete until the water has been actually applied to a beneficial use. But does the fact that the actual application to a beneficial use is necessary for a completed appropriation affect or control the method or means by which such appropriation is initiated? That is what we are required to determine in this case in view of the language of section 41 herein quoted.

In the early settlement of Utah the same policy or rule of law applied to the appropriation of the public waters as prevailed in other arid states, namely, first in time, first in right. The first Utah legislative act, so far as I have been able to ascertain, respecting the method or mode of appropriating water, was passed by the Legislature of 1897 (Laws 1897, c. 52). Prior to that legislation there had been some acts requiring that notices be recorded in the several county recorders' offices of appropriations actually made. These recording acts did not, however, undertake to point out any particular mode of making the appropriations. By the act of 1897 any person desiring thereafter to appropriate water was required to post notices in writing in two conspicuous places, one at the post office nearest the point of intended diversion, and the other at the point of intended diversion. The statute further provided certain things to be stated in

those posted notices, and also provided for the recording of the notices of appropriation, and specified certain additional facts to be stated in the recorded notices. Apparently no other or further legislation was enacted respecting the appropriation of water until 1903. ˙ (Laws 1903, c. 100.) The Legislature in that year incorporated in the act relating to water rights and irrigation section 41 as the same appears in chapter 67, Laws Utah 1919. Numerous amendments were made to the irrigation laws of this state by the Legislatures meeting since 1903, but in none of such legislation has the method or manner of appropriating water as prescribed by the Legislature of 1903 been changed or modified.

The states of Wyoming, Idaho, and Montana have enacted legislation respecting the manner of appropriating the public waters of those states. Idaho and Wyoming and possibly Montana, formerly had statutes similar to our act of 1897. There is later legislation in each of those states respecting the method of appropriating water. The Supreme Court of Wyoming and the Supreme Court of Idaho have held, both under the former and present statutes of those states, that the method prescribed is not exclusive, that the appropriation of the water for a beneficial use by actually diverting and applying it to such use is a completed appropriation, and, as such, constitutes a valid appropriation as against one filing an application subsequent to the date of the completed appropriation. *Pyke* v. *Burnside,* 8 Idaho, 487, 69 P. 477; *Furey* v. *Taylor,* 22 Idaho, 605, 127 P. 676; *Whalon* v. *North Platte, etc., Co.,* 11 Wyo. 313, 71 P. 995; *Nielson* v. *Parker,* 19 Idaho, 727, 115 P. 488; *Idaho Power & Tr. Co.* v. *Stephenson,* 16 Idaho, 418, 101 P. 821. The trial court in this case relied upon those decisions in concluding that respondent Hooppiania had, by actually diverting the waters of the springs and applying the same to a beneficial use, acquired a right that could not be disturbed by any one filing an application in the state engineer's office subsequent to the date of the actual appropriation, provided Hooppiania proceeded within a reason-

able time to perfect his appropriation by making an application to the state engineer.

The same rule or practice that existed in Utah relative to the appropriation of any of the public waters of the state prior to legislative enactment prevailed in our sister states of Idaho and Wyoming. In the absence of legislation, that method of acquiring water rights still prevails in the arid states. The language of the statutes of Idaho and Wyoming does not expressly or by necessary implication abolish the old recognized means of appropriating water. The language of the Utah statute is that **3** "rights to the use of the unappropriated public water in the state may be acquired by appropriation, in the manner hereinafter provided, and not otherwise." Laws 1919, c. 67, § 41. If our statute did not contain the words "and not otherwise," then the decisions of the appellate courts of Idaho and Wyoming ought to and would have much weight in a determination of the question now under consideration.

It is a matter of common knowledge in this state that many controversies arose between claimants and much litigation resulted prior to our legislative act of 1903 respecting the dates of the appropriation by different claimants of the waters of the state. Very much of that litigation had **4** to do exclusively with the dates of the appropriations. The rule or principle of law that he who was first in time was first in right had become permanently established in the jurisprudence of the state. The fact as to who was a prior appropriator was in much, if not all, of the litigation a controverted question, and one which in many cases was most difficult to determine by reason of there being no public record of just when such appropriations were made. It is therefore not only reasonable and fair to conclude, but affords a strong argument to support the claim, that the language found in the act of 1903 was intended to mean and does mean that the only method to be recognized thereafter was the method therein prescribed.

The method or mode prescribed by the statute in the state

of Wyoming is found in Comp. Stat. Wyo. 1920, § 835; in Idaho, 2 Idaho Comp. Stat. 1920, § 5568.

We are of the opinion, and so hold, that the Legislature of Utah, by the act of 1903, intended to limit the method of acquiring any rights to the unappropriated public waters of the state to the method or means prescribed in that act. The rights attempted to be acquired by respondent Hooppiania by actually diverting the water and applying the same to a beneficial use must therefore be held to be subject to the right of appellant who will acquire the first right by completing its appropriation initiated by its application filed in the state engineer's office on April 25, 1918.

It does not satisfactorily appear in this record that all or any of the springs in controversy were, at the time of the filing of the application by appellant, located upon public domain. True it is that the court in its conclusions of law finds that the waters of these springs were then public waters upon the public domain. Whether the springs were at that time located upon public domain is a question of fact to be found, and not a conclusion of law to be drawn. The maps introduced as exhibits indicate that at least springs No. 1, No. 2, No. 3, and No. 7 are located upon the homestead of respondent Hooppiania. If so, they were not upon the public domain. We do not find any conclusive evidence in the record as to whether or not the lands upon which these springs are located were part of the public domain at the time of the attempted appropriation. The waters from the springs in controversy were not sufficient in volume to run into or create a natural channel, and were not sufficient in volume to run to appellant's land, and would not reach appellant's land without being fed by water from other sources. The waters of the springs are therefore percolating waters, and if such springs are located upon private lands the waters arising therefrom are not subject to appropriation. *Stookey* v. *Green*, 53 Utah, 311, 178 P. 586; *Peterson* v. *Eureka Hill M. Co.*, 53 Utah, 70, 176 P. 729; *Willow Creek Irr. Co.* v. *Michaelson*, 21 Utah, 248, 60 P. 943, 51 L. R. A. 280, 81 Am. St. Rep. 687. Such of the springs as are located

upon the homestead of Hooppiania are not upon the public domain, and are therefore not subject to appropriation by appellant.

Respondents have filed cross-assignments of error, and complain of the court's judgment wherein the waters of springs No. 11 and No. 12 were awarded to appellant during the flood-water season. What has been said in the discussion of appellant's assignments is conclusive in regard to respondents' right to the use of the waters of those two springs.

The cause is remanded to the district court with directions to ascertain whether any or all of the various springs were, in April, 1918, located upon public domain, and, having ascertained that matter, to enter a decree in conformity with the views herein expressed.

CHERRY, J., concurs.

THURMAN, J.  I concur in the opinion of Mr. Chief Justice Gideon that chapter 67, Sess. Laws of Utah 1919, provides an exclusive method for the appropriation of public water in the state of Utah. The very language and purpose of the act, when construed in connection with the acts which it superseded and repealed, demonstrates conclusively that the purpose was to provide an exclusive method of appropriating water and securing a record title thereto. I do not deem it necessary to enter upon a review of the statutes of neighboring states, nor the decisions of their courts interpreting the same, for the reason that the review made by my associate, Mr. Justice Straup, and the decisions referred to by him in his dissenting opinion conclusively demonstrate that the statutes of such states are materially different from our own, and the decisions interpreting the same have no bearing whatever upon the question presented on this appeal. We only need to refer to the language of the present Utah statute and the statutes which preceded it in order to determine that the present statute provides an exclusive method of appropriating public water in this state.

The first attempt at legislation providing a method for the appropriation of water was the act of 1897, compiled in

Rev. Stat. 1898, commencing with section 1268. That statute provides that an appropriation of water shall be made by posting a notice at the point of diversion and a copy thereof at the nearest post office, and also provides that the notice shall be filed for record in the office of the county recorder. The notice was to contain the number of cubic feet per second, the purpose and intended use, if for irrigation the number of acres to be irrigated, and the means of diversion whether pipe, flume, or ditch, and the size thereof, together with the date of appropriation and the name of the appropriator. The work of construction was to be prosecuted with reasonable diligence. Section 1271 is significant in this connection as showing the principal vice of the act. I quote the section at length:

"A failure to comply with the provisions of this title deprives the appropriator of the right to the use of water as against a subsequent claimant who complies therewith, but by complying with the provisions of this title, the right to the use of the water shall relate back to the date of posting the notice."

The principal vice of the section quoted rests in the fact that it recognizes the right to make an appropriation by a method or methods other than that provided in the act. For instance, the act was susceptible of the interpretation that if a person initiated an appropriation by simply entering upon the banks of a stream or water course and diverted water therefrom and applied it to a beneficial use, his right would be superior to that of one subsequently complying with the act. In such case there would be no record whatever of the appropriation, and no means of supplying a record without resorting to litigation with all the uncertainty, hazard, and expense incident thereto. Under that statute the interpretation contended for by Mr. Justice Straup and Mr. Justice Frick, who also dissents from the opinion of the Chief Justice, could well be sustained. But the Legislature of 1903 was dissatisfied with that character of legislation, and enacted a law to remedy the mischief. It created the office of state engineer; it inaugurated a thorough system by which an appropriation could be initiated, title secured, and public record thereof made, thereby abrogating the old system with all its at-

tendant evils and opportunities for perjury and other forms of abuse. The method presented for appropriating water commences with chapter 100, Sess. Laws 1903, § 34, which section furnishes the key for interpreting all that follows down to and including section 46. Section 34 reads as follows:

"Rights to the use of any of the unappropriated water in the state may be acquired by appropriation, in the manner hereinafter provided, and not otherwise. The appropriation must be for some useful or beneficial purpose, and, as between appropriators, the one first in time shall be first in right."

The subsequent sections, to and including section 46, mark the successive steps in the course of procedure from the date of filing the application with the state engineer to the issuance by him of a certificate of appropriation to the appropriator or his assignee or successor in interest. Record is made of every step taken and opportunity afforded for the adjustment of any contested right. The certificate of appropriation is not issued until the water has been applied to a beneficial use and the provisions of the statute fully complied with. Nowhere in the entire act is there the slightest recognition of any other method of appropriation, as appears in the bungling, antiquated method provided in the act of 1897.

The act of 1903 was amended in certain respects, immaterial here, in the Session Laws of 1905, without changing the number of the sections. Chapter 108. Section 34 of that act is identical with section 34 of the act of 1903, although, as before stated, other sections were amended. The same language is employed in Comp. Laws 1907, § 1288x5. The changes made in other sections after 1903 also appear in the compilation.

In 1909 (Laws 1909, c. 62), the act again came under review by the Legislature. Amendments were made to other sections, but nothing was done affecting the question under review here. In 1911, section 1288x5, supra, was amended with other sections, but the amendment was a proviso added to the section, leaving the language heretofore quoted unaltered in any particular. The fact that the section was amended in other respects shows conclusively that the Legis-

lature had the section under review, but did not deem it expedient to change the language thereof, which implies an exclusive method of appropriation. Sess. Laws 1911, p. 143.

In 1915 (Laws 1915, c. 83), the Legislature again amended other sections of the act, but made no change whatever in the section in question, or any other section affecting the exclusive terms of the act.

In the session of 1917 the Legislature compiled the laws without change or alteration. Comp. Laws 1917, § 3450.

In 1919 the Legislature enacted the law as it now stands, repealing all prior laws relating to the appropriation of water and acquiring title thereto. Chapter 67, Sess. Laws 1919, p. 177. Section 41 of the act, page 188, declares certain fundamental principles pervading the whole act and immediately precedes the mode of procedure necessary to procure title. The section reads:

"Rights to the use of unappropriated public water in the state may be acquired by appropriation, in the manner hereinafter provided, and not otherwise. The appropriation must be for some useful and beneficial purpose, and, as between appropriators, the one first in time shall be first in right; provided, that when a use designated by an application to appropriate any of the unappropriated waters of the state would materially interfere with a more beneficial use of such water, then the application shall be dealt with as provided in section 48 hereof."

The history of the legislation upon this subject, as above set forth, discloses the fact that the statute involving the question now before the court has been under review at eight different sessions of the Utah Legislature. The law, as originally enacted in 1903, has been amended and changed in divers respects, immaterial as far as the question here is concerned, but the manifestly exclusive features of the method of procedure to procure title have never been changed.

The question is, if the Legislature of the state of Utah had the power to enact an exclusive method of initiating an appropriation of water, and procuring a title thereto, what else could it have done or what more could it have said than has been done and said through all this course of legislation down to the present time? If plain, emphatic, unequivocal lan-

guage is not sufficient to express the intention of the Legislature, in what manner and by what means can the Legislature express its intention? If there were a single line, word, or thought anywhere in the act inconsistent or in conflict with the express declaration of the Legislature at the very starting point of the method of procedure mapped out by the Legislature, I would concur in the suggestion that we should resort to rules of construction in order to determine the intention of the statute; but the truth is the statute is so plain from the beginning to the end of the whole course of procedure that there is no occasion for resorting to rules of construction. Nevertheless, assuming that construction is necessary, I unhesitatingly adopt the rules announced by my associates who disagree with the majority as to the proper interpretation of the statute. Mr. Justice Straup states the rule as follows:

"In the interpretation and construction of statutes the primary rule, of course, is to ascertain and give effect to the intent of the Legislature, which intent and meaning must primarily be determined from the language of the statutes themselves; and in ascertaining such intent every word and phrase and each and every part of the act should be considered and given effect. But in doing so it is not proper to consider a word or phrase in and of itself or disconnected from other parts of the act."

Mr. Justice Frick states the rule in the following language:

"All, I think, will agree that it is a cardinal canon of construction that all words and phrases must, if possible, be given effect. While it is true that words must be given their usual and ordinary meaning, it is equally true that there are many instances where particular words or phrases must be given a restricted or enlarged meaning so as to harmonize all the provisions of a particular act and to give all of it proper effect."

But it is earnestly insisted that the majority of the court attach undue importance to the phrase ''and not otherwise.'' For my part I disclaim any intention of attaching undue importance to any particular word, phrase, or sentence in the statute. My position is, that when successive sessions of the Legislature, running through a period of 21 years, have tenaciously adhered to a certain form of procedure, and that form of procedure from beginning to end is manifestly exclusive of

every other method, it is the imperative duty of this court when the statute is brought in question before us to interpret it according to its plain meaning and intent, such meaning and intent to be ascertained by applying the very rules announced by my associates who disagree with the majority as to the meaning of the statute. If we appear to attach special importance to particular words, phrases or sentences it is because the Legislature itself appears to have done so when the statute was first enacted, and continued to do so throughout all the vicissitudes of subsequent legislation upon the subject. Those who disagree with us upon the theory that we are placing too much stress upon certain portions of the act, without giving due consideration to other parts, ought, at least, to point to some part of the act which we have ignored or have not given due consideration. Until they have done so we feel amply justified in contending that the first sentence in section 41, above quoted, is absolutely mandatory and means exactly what the language implies. But it is contended that the statute also declares that the right of the public to the waters of the state is "subject to all existing rights to the use thereof" (Laws 1919, c. 67, § 1), and also declares that "where there is no unappropriated water in the proposed source of supply, or where the proposed use will conflict with prior applications or existing rights  *  *  * it shall be the duty of the state engineer to reject such application" (Laws 1919, c. 67, § 48).

It is quite clear to the understanding of the writer that the term "existing rights" used in the statute means rights existing either at the time when the act became a law, which rights, of course, the act could not destroy, or rights existing under a former application made in pursuance of the act. To assume that the term "existing rights" means rights accruing after the act became a law, by merely entering upon the water source, diverting the water thereof, and applying it to a beneficial use without filing an application with the state engineer, would be begging the question and assuming as a fact the sole matter in dispute. I and my associates with whom I agree are just as tenacious in the matter of preserv-

ing vested and existing rights as our dissenting associates can possibly be, but we are equally tenacious in holding that our interpretation of the statute will not, and cannot, disturb such rights when the source thereof is properly understood. To make our meaning perfectly clear: If a person had initiated a right under the old system prior to the act of 1903 and was prosecuting the same with reasonable diligence, or had prosecuted it to completion, such right would be an existing right and not within the purview of the act; or, if a person had made a prior application to the state engineer after the passage of the act and such application had been kept alive under the terms of the act, the right would be an existing right, and any subsequent application for the same right should be rejected by the state engineer as provided in the statute. Any other interpretation, in my opinion, is not permissible when the statute is considered as a whole. The same may be said as to the term "unappropriated water," stressed by dissenting associates as of special significance. In our opinion that term, as used in the statute, means water not already appropriated in compliance with the act or some previous act or custom while the same was in force.

But it is also contended that this court, in *Sowards* v. *Meagher*, 37 Utah, 212, 108 P. 1112, considered the statute in question, and that for 15 years that case has stood as the correct construction of the statute without modification by either the court or the Legislature. It would be unpardonable in me, or any other member of this court, to willfully ignore or disregard any former decision of this court, if such decision is, in any sense, authority for either side of the controversy. The case referred to was a litigation between two claimants under applications filed in the office of the state engineer. The applications were for water to be applied on lands on the Uintah Reservation, which was not restored to the public domain by proclamation of the President until August 28, 1905. An act of Congress (33 Stat. 1069), had, however, been previously passed providing for restoration to the public domain at such time as the President would

by proclamation direct. The defendants filed their applications with the state engineer on July 31 and August 19, 1905. Plaintiff filed his application August 28 of the same year, the very day the reservation was open for entry by the President's proclamation. The principal question was whether an application for water to be used on land not open to entry was valid. If valid, defendants' applications were superior, because first in time. The complaint of plaintiff 'stated the facts which were, substantially, as above set forth. The state engineer had found in favor of defendants. On appeal to the district court a demurrer to the complaint was sustained. On appeal to this court the judgment of the lower court was affirmed. In concluding its opinion, on page 225 of the report (108 P. 1117), the court said:

"We are of the opinion that, upon the face of the complaint, it is not made to appear that the engineer wrongfully or erroneously approved the defendant's applications, which were prior in time."

Accordingly, the judgment sustaining the demurrer was affirmed. Such, in substance, were the issues in that case, and such was the decision thereon. Whether or not the statute provided an exclusive method of appropriation was in no sense involved, for both parties were claiming under applications filed with the state engineer. The court decided in favor of the prior application. The decision was right and in strict compliance with the statute.

It may be admitted once for all that, as between two litigants claiming a right to the use of water, neither of whom have filed an application with the state engineer, the one in possession would have the better right, and such right would be upheld in a court of justice. *Mt. Olivet Cemetery Ass'n et al.* v. *Salt Lake City et al.*, 65 Utah 193, 235 P. 876 (a very recent decision not yet [officially] published). In support of that doctrine Mr. Justice Cherry, who wrote the opinion in the case above referred to, quoted an excerpt from 1 Wiel on Water Rights (3d Ed.) § 411, which was not only pertinent to the point to which it was applied in that case, but is also pertinent to the issue presented in the case at bar. I quote the excerpt as it appears in the Mt. Olivet Case:

"The older statutes, based on the California Civil Code, were merely to regulate the doctrine of relation, while the new statutes described in this chapter are not limited to that purpose, and seem to aim at a comprehensive and exclusive method of appropriating. But it would seem necessarily, upon general principles of law, that between two parties, neither of whom has a permit, prior possession must prevail at least until one or the other is approved by the state engineer."

Before concluding this opinion I feel impelled to say that this statute has been in force for a period of 22 years. Hundreds of thousands of dollars of the public money have been expended in maintaining suitable offices and paraphernalia for carrying out the purposes of the act, to say nothing about the amounts paid in salaries to the state engineer and his deputies, assistants, and clerks. It cannot be denied that a system whereby a complete record is required of rights and titles to the use of water is infinitely superior to a system, if it can be called a system, in which the evidence of title rests entirely in parol and depends solely upon the memory of man. It may be contended that this goes to the policy of the act which belongs exclusively to the Legislature, and is therefore outside the domain of judicial interpretation. We contend, however, that if the policy of the act is manifestly wise and superior to previous systems from the standpoint of policy, it is one of the most cogent reasons why we should hold that the Legislature must have intended exactly what it said and has repeated and reiterated time after time for almost a quarter of a century.

And finally, it may be said there are many reasons to believe that the construction of the statute for which we contend has been accepted by practically all the people of Utah ever since its first enactment in 1903. There has been no clamor to the contrary among the masses of the people, for if there had been their senators and representatives in the Legislature would long ago have demanded a change in the wording of the statute, and the change would have been made. The statute, as far as the question here is concerned, has been in force for 22 years, and this is the first time the question has come before the court. There never will be a

more favorable opportunity for settling the question than now, for the reason that, independent of the statutory question presented, the right of the defendant to any of the waters in dispute, even under the old method of appropriation, is extremely doubtful. As far as the rights of others not parties to this action are concerned, I have no reasons to believe there are any claiming rights under the old method of appropriation except those whose rights were initiated prior to the act of 1903.

In addition to the foregoing, I also concur in the order remanding the cause for the reason stated in the opinion of Mr. Chief Justice GIDEON.

STRAUP, J. I do not concur in the holding that a valid appropriation of unappropriated waters can be made only by filing an application with the state engineer as by our statute provided; nor that a compliance with the statute in such particular is requisite to a valid appropriation; nor that the method of acquiring a right to the use of water as by the statute provided is exclusive.

It is conceded that the essentials of an appropriation are an intent to appropriate, an actual diversion of waters and applying them to a beneficial use. That was true before the statute, and is true under the statute. No matter what the form or method may be in making an appropriation, the foundation of the appropriation, nevertheless, is an actual diversion of waters and making a beneficial use of them. The right rests on possession—the actual taking of waters, diverting them and beneficially using them. Ownership of the corpus of public unappropriated water may not be acquired. The right thereto is only possessory. Such possession may be evidenced by methods other than as prescribed by the statute. There is no better evidence of possessing anything than by seizing and taking it. The right to possess it, of course, may be involved and questioned; but actual possession is good evidence and notice of claim of right. It is good as against every one who can assert no better right. An actual taking, diverting, and beneficially using water is as much notice of a

claim of right as the making of an application or the posting of a notice. Since the right to the use of water rests on possession, he who is first possessed of public and ·unappropriated waters, who took them, diverted and beneficially used them before intervening claims, acquires the first and the best right. Hence the maxim so frequently asserted and applied to appropriation of waters—first in time, first in right. Such doctrine is not disturbed, but is recognized by the recent codes and statutes, including our own, relating to appropriations of public and unappropriated waters. It is the foundation upon which all appropriations rest under the codes and statutes as well as before their adoption. No matter what the method or procedure may be, there is no valid or completed appropriation until an actual diversion of the waters is made and the waters beneficially applied. All else is but initiatory thereto.

The early customs out of which the law of appropriations grew were based on the principle that rights on the public domain were open to all, the first possessor being protected, and that all should have an equal chance. And the doctrine always prevailed that the right to the use of public waters was not complete until the waters were actually taken into one's possession and beneficially used. In connection therewith there grew up also what is known as the doctrine of relation back, which, before these recent statutes, was recognized and applied in different jurisdictions; that is, the right to possession, diversion, and use related back to the commencement of the work or public declaration of an intention to appropriate. Hence, even before the statutes, in some jurisdictions, a notice of intention to appropriate was posted at the place of intended diversion of waters from the stream, designating the quantity of water intended to be appropriated and the use to be made thereof and the manner and means by which the waters were to be diverted; and when such was done and the work prosecuted with reasonable diligence, the right to the use of the waters, when actually diverted and beneficially used, related back to the posting of the notice or commencement of the work or declaration of

intention.   But the application of the doctrine of relation back led to some confusion and controversy; and, in some instances, to mere speculation in dealing in and vending of water rights and titles.   There thus in the doctrine were involved questions of bona fides of intentions to appropriate, reasonable diligence in the prosecution of the work, and other kindred matters.   To avoid or overcome such controversies, usually arising in the application of the doctrine, and to preserve evidence of rights and title to the use of waters, led to the enactment of the recent codes or statutes concerning the appropriation of waters.   Such was the scope and object of the statutes generally, differing only in detail or method. Such, I think, is the scope and purpose of our statute.

One of the first statutes on the subject is that of California. In such particular the California statute provides that all water or the use of water within the state is the property of the people of the state; that the appropriation must be for some useful or beneficial purpose; that a person desiring to appropriate water "must post a notice in writing in a conspicuous place at the point of intended diversion," stating therein the quantity of water claimed, the purpose for which it is claimed, the place of intended use and means by which it is intended to be diverted, and the size of flume, ditch, etc., and requiring a copy of the notice to be recorded in the office of the recorder of the county in which the notice is posted.   The statute further provides the time within which the claimant must commence the construction of the works, etc., and contains other requirements not necessary here to notice; that upon compliance with such statutory provisions the claimant's right to the use of water related back to the time the notice was posted; that "all persons who have heretofore claimed the right to water, and who have not constructed works in which to divert it, and who have not diverted nor applied it to some beneficial purpose, must, after this title takes effect, and within twenty days thereafter, proceed as in this title provided, or their right ceases."   The statute further provides that "a failure to comply with such rules deprives the claimants of the right to the use of the

water as against a subsequent claimant who complies therewith.''

In considering this statute, the Supreme Court of California, in the case of *Lower Tule, etc., Co.* v. *Angiola, etc., Co.*, 149 Cal. 496, 86 P. 1081, held that to make a valid appropriation it was not necessary to post and record a notice of appropriation as provided by the Code, and that—

"The method of acquiring a right to the use of water as there prescribed is not exclusive. One may by a prior actual and completed appropriation and use, without proceeding under the code, acquire a right to the water beneficially used, which will be superior and paramount to the title of one making a subsequent appropriation from the same stream in the manner provided by that statute."

Many cases from that jurisdiction are cited, among them *De Necochea* v. *Curtis*, 80 Cal. 397, 20 P. 563, 22 P. 198, *Wells* v. *Mantes*, 99 Cal. 583, 34 P. 324, and *Watterson* v. *Saldunbehere*, 101 Cal. 112, 35 P. 432. In these cases, as well as in other cases cited in *Lower Tule, etc., Co.* v. *Angiola, etc., Co.*, the scope and purpose of the statute are considered and held to be as hereinbefore indicated.

The Wyoming statute (Comp. St. 1920, § 835), provides that the water of the state is the property of the state; that beneficial use is the basis, measurement, and limit of the right to the use of water, and that ''any person, association or corporation hereafter intending to acquire the right to the beneficial use of the public water of the state of Wyoming shall, before commencing the construction, enlargement or extension of any ditch * * * make an application to the state engineer for a permit to make such appropriation,'' and also contains provisions as to the commencement and completion of the works, applying the water to a beneficial use, the making and filing of proof, maps, etc., and when the appropriation is made in accordance with the statute it provides that ''the priority of such appropriation shall date from the filing of the application in the engineer's office.'' Section 850. The statute, in substance, is like ours. In considering the Wyoming statute the federal court, in the case of *Morris* v. *Bean* (C. C.) 146 F. 423, after observing that the complainant had not complied with the statutory requirements of

Wyoming, and that the inquiry was whether an appropria-
tion of water could be made by diversion and beneficial use
without complying with the statute, said:

"Long before the enactment of any statute in the arid states
or territories, the custom of taking water had ripened into the
right to use it [citing cases]. After the custom had been fully
established, statutes were enacted for the purpose of protecting
appropriators by furnishing a public record, thereby avoiding dis-
putes over priorities. It cannot be said that these statutes were
enacted for the purpose of enabling the appropriator to claim by
relation to the date when work was begun, because that was the
rule prior to any legislation upon the subject, if the work was
prosecuted with reasonable diligence [citing cases]. But the rule
of relation was in a measure uncertain, * * * in that what
constituted reasonable diligence in the completion of the work
was a matter within the sound discretion of the courts. Again,
the appropriator who initiates his right by statutory notice is re-
quired to designate the amount of water claimed, the purpose for
which it is to be used, if for irrigation, the land upon which
it is to be applied, etc., thus affording information to other in-
tending appropriators and giving constructive notice as to the
amount of water which has already been claimed from the common
source of supply. But where one has actually diverted water
and is using it, the right to its use may, by analogy, be likened
unto the doctrine that one purchasing real estate must take notice
of the rights of those in possession, notwithstanding the recording
statutes. Water diverted from a stream naturally diminishes the
volume. One seeking to acquire the right to the use of water must
take notice of the amount available and visible, and it must be
conclusively presumed that he inquires into the extent of the
supply from which the water is to be drawn, and how that supply
has been diminished by others whose rights are prior in time.
These statutes were never intended to destroy the right of appro-
priation by methods other than those defined by them. Their
only effect is to deny the power of an appropriator who fails to file
the notice required to claim as of the date of the beginning of his
work; the penalty for such failure being to limit the right to the
time when the water is actually applied and used. Long on Irri-
gation, § 39, expresses the principle in this language: 'The statutes
did not change the rule as to what constitutes an appropriation,
but their object was simply to preserve evidence of the appropri-
ator's rights, and to regulate the doctrine of relation back. In
accordance with these principles, it is held that one who fails to
comply with the statutory requirements, but who actually diverts
water, and applies it to a beneficial use, in the absence of any

conflicting adverse claim, acquires a valid title thereto, which cannot be divested by another appropriator, who complies with the terms of the statute after the former has completed his appropriation. * *· * Where the statutory requirements have not been complied with the rights of the appropriator, which, but for the statutes, would relate back to the commencement of the work of appropriation, relate back only to the completion of the work; this being the only change wrought in the law by the statutes.'

"These views are sustained by numerous authorities: *Murray et al.* v. *Tingley*, 20 Mont. 260, 50 P. 723; *Wells* v. *Mantes et al.*, [99 Cal. 583], 34 P. 324; *Cruse* v. *McCauley* (C. C.) 96 F. 370; *De Necochen* v. *Curtis* [80 Cal. 397], 20 P. 563, reaffirmed 22 P. 198; *Burrows* v. *Burrows et al.* [82 Cal. 564], 23 P. 146; *Watterson* v. *Saldumbehere* [101 Cal. 107], 35 P. 432."

This case was affirmed by the Circuit Court of Appeals, 159 F. 651, 86 C. C. A. 519. With respect thereto that court said:

"The circuit court held, and we think rightly, that it was not the purpose of the statute referred to to provide an exclusive method of appropriation, and that its only effect, was to take from an appropriator who failed to file such notice the right to claim an appropriation as of the date of the beginning of the work of diversion. * * * This is the construction placed upon similar statutes in other states requiring the filing and recordation of claims to water. *Murray* v. *Tingley*, 20 Mont. 260, 50 P. 723; *Wells* v. *Mantes*, 99 Cal. 583, 34 P. 324; *Watterson* v. *Saldumbehere*, 101 Cal. 107, 35 P. 432."

It is thus seen that the federal courts regarded the California statute, requiring the posting and recording of a notice, and the Wyoming statute, the making of an application before the state engineer, in scope and purpose of substantially the same purport, differing only in detail. The same conclusion, in effect, was reached by the Supreme Court of Wyoming. *Whalon* v. *North Platte Canal & Colonization Co.*, 11 Wyo. 313, 71 P. 995; *C. B. & Q. R. Co.* v. *McPhillamey*, 19 Wyo. 425, 118 P. 682, Ann. Cas. 1913E, 101.

The Montana statute (Rev. Codes 1921, § 7100), provides that the appropriation must be for some useful or beneficial purpose, and that "any person hereafter desiring to appropriate the waters of a river, or stream * * * must post a notice in writing in a conspicuous plate at the point of in-

tended diversion, stating therein'' the quantity of water claimed, the purpose for which it is claimed, the means of diversion, date of appropriation, and name of the appropriator, and requiring a copy of the notice to be filed with the county clerk of the county in which the notice is posted. It provides the time within which the construction work must be done, and provides other requirements for a competent appropriation. It further provides: ''A failure to comply with the provisions of this chapter deprives the appropriator of the right to the use of water as against a subsequent claimant who complies therewith, but by complying with the provisions of this chapter the right to the use of the water shall relate back to the date of the posting of notice'' (section 7102), and that ''persons who have heretofore acquired rights to the use of water shall within six months after the publication of this chapter, file in the office of the county clerk of the county in which the water right is situated'' (section 7103), a verified declaration in writing setting forth the same facts as are required to be stated in the posted notice.

In considering this statute the Montana court, in the case of *Murray* v. *Tingley,* 20 Mont. 260, 50 P. 723, said that the construction of the California statute by the Supreme Court of that state was logical and correct, and that the Montana statute should be construed in the same manner; that prior to the act a valid appropriation of water was made by an actual diversion and beneficial use, and that the doctrine of relation back was recognized by Montana prior to the statute. The court further said:

"Questions of priority, however, as well as of the original capacity, etc., of ditches, depended chiefly on oral testimony—on the memory of eye witnesses, often at fault through lapse of time. Confusion and insecurity to vested rights resulted. To obviate this as much as possible, the statute was enacted. It required a notice of location to be posted at the point of diversion, to apprise others who contemplated the acquisition of water rights from the same sream that the locator had taken his initial step to appropriate water. It required a recorded notice of appropriation, in order that a record might be supplied, giving the history in detail of each appropriation, which would inure to the benefit of their successors in interest, as well as to the appropriator's, aid not leave

them dependent upon the mere memory of witnesses when conflicts should arise. In enacting this law the Legislature did not contemplate that one who failed to comply with the terms of the statute, but who, in the absence of any conflicting adverse right, had nevertheless actually diverted water and put it to a beneficial use, should acquire no title thereby. The essence of an appropriation—a completed ditch, actually diverting water, and putting it to a beneficial use—remained the same as it had been before. The object of the statute was to preserve evidence of rights, and also to regulate the doctrine of relation back. It follows that the statute controls this doctrine of relation back, and that one who seeks to avail himself of it since the passage of this act can only do so by a compliance with the statutory requirements.

"Again, we are satisfied that the Legislature did not intend that one who failed to comply with the statute, but who had nevertheless actually diverted water, could be deprived of it by another who complies with the statute at a time subsequent to the former's completed diversion. See *Wells* v. *Mantes*, 99 Cal. 583, 34 P. 324, and *Watterson* v. *Saldumbehere*, 101 Cal. 107, 35 P. 432."

In the case of *Bailey* v. *Tintinger*, 45 Mont. 154, 122 P. 575, the Montana court stated that it was well known, that the law itself had its origin in the customs of miners and others in California; that these customs had ripened into well-recognized rules before there was any legislation upon the subject; that those customs were subsequently recognized as having the force of law by state and national legislation and by decisions of courts, and that the right of an appropriator to use water depended upon his appropriation of it by diversion and beneficial use. *Murray* v. *Tingley*, supra, is again considered and approved, as well as a number of California cases, and the doctrine of relation back again stated to be a prominent feature of the statute. The court finally observes:

"We are of the opinion that the act of 1885 intended: (1) To preserve the right which the appropriator had theretofore; and (2) to provide an additional method of making an appropriation. In other words, during the first period of our history above, there was but one method of making an appropriation, and that was by complying with the rules and customs of the pioneer settlers; while during the period since 1885, two distinct methods are prescribed—the first by complying with the rules and customs of the early settlers, and the second by complying with the terms of the statute."

The court then approvingly quotes from 1 Wiel on Water Rights, § 364, where the author in referring to these statutes says :

"An appropriation may be made by a complete, actual diversion for a beneficial purpose, without following the statute, or else by proceeding under the statute."

To the same effect are also the Washington Decisions considering a statute similar to those of California and Montana. *In re Water Rights in Crab Creek and Moses Lake*, 235 P. 37. See, also, 17 A. & E. Ency. Law, 498.

The Idaho statute (C. S. §§ 5568, 5569), provides that all waters of the state are the property of the state, that the appropriation must be for some useful or beneficial purpose, and that "all rights to divert and use the waters of this state for beneficial purposes shall hereafter be acquired and confirmed under the provisions of this chapter. And after the passage of this title all the waters of this state shall be controlled and administered in the manner herein provided," and that "for the purpose of regulating the use of the public waters and of establishing by direct means the priority right to such use, any person, association or corporation hereafter intending to acquire the right to the beneficial use of the waters of any natural stream * * * shall, before commencing the construction * * * of the ditch, canal, * * * make an application to the [state engineer] for a permit to make such appropriation." Provisions are made as to what shall be set forth in the application and with respect to the commencement and completion of the construction work, filing of maps, etc., similar to our statute, and provides that when the appropriation is made in accordance with the statute the priority shall date from the date of the application for the permit. It, like the Wyoming and our statute, has provisions respecting the filing of protests, the hearing of them, and taking appeals. A consideration of this statute has been before the Supreme Court of Idaho in a number of cases. Uniformly it has been held by that court that there are two methods by which one may acquire a prior right to the use of water of a stream where he actually diverts and

applies the water to a beneficial use although he may never have applied to the state engineer for a permit to do so. In *Crane Falls, etc., Co.* v. *Snake River, etc., Co.*, 24 Idaho, 77, 133 P. 661, it is said:

"Under the laws of this state there are two methods of acquiring water rights: One is to follow the statutory procedure and file an application for water with the state engineer, in which case there is a vested right which dates its inception from the time of filing the application with the state engineer. The other is to divert unappropriated water and apply it to a beneficial use without making application to the state engineer, which right dates from the application of the water to a beneficial use. The statutory method is the exclusive method by which the right can relate back to the filing of the application with the state engineer."

This case was approved by the same court in *Reno* v. *Richards*, 32 Idaho, 1, 178 P. 81, where the court again considered the doctrine of relation, and held that one could avail himself of such doctrine only by complying with the statute, and reaffirmed the doctrine that a valid appropriation without compliance with the statute could be made by actual diversion and beneficial use before intervening rights. There are numerous other Idaho cases to the same effect, among them *Nielson* v. *Parker*, 19 Idaho, 727, 115 P. 488, *Youngs* v. *Regan*, 20 Idaho, 275, 118 P. 499, and *Furey* v. *Taylor*, 22 Idaho, 605, 127 P. 676. In *Basinger* v. *Taylor*, 30 Idaho, 289, 164 P. 522, the court held that a permit issued by the state engineer was not a water right, and was not, in itself, evidence of the appropriation of water; that an appropriator of water seeking to invoke the doctrine of relation so that the date of his appropriation may relate back to the date of the initiation of his appropriation, must show a substantial compliance with all the provisions of the statute and a final consummation of the appropriation, and can invoke the doctrine only to the extent of a completion of such appropriation. To the same effect is the case of *Washington State Sugar Co.* v. *Goodrich*, 27 Idaho, 26, 147 P. 1073, where it is stated that:

"The granting by the state engineer of a permit for the right to use the waters of this state, in and of itself secures to the applicant no right to the use of the waters applied for in said permit, unless there be a substantial compliance with each and every provision

of the statute relating to or in any manner affecting the issuance of such permit and a fulfillment of the conditions and limitations therein, but a compliance with the conditions and limitations prescribed in such permit initiates a right to the use of the water in the applicant, and said right then becomes a vested one and dates back to the issuance of said permit."

I now come to the Utah statute (Comp. Laws 1907). It declares that the water of all streams, etc., in this state "is hereby declared to be the property of the public, subject to all existing rights to the use thereof" (section 1288x18); that "beneficial use shall be the basis, the measure and the limit of all rights to the use of water in this state (section 1288x20); that "rights to the use of any of the unappropriated water in the state may be acquired by appropriation, in the manner hereinafter provided, and not otherwise" (section 1288x5), and that the appropriation must be for some useful or beneficial purpose; that "any person, corporation or association to hereafter acquire the right to the use of any public water in the state of Utah shall, before commencing the construction, enlargement or extension of any ditch, canal, or other distributing works * * * make an application in writing to the state engineer" (section 1288x6). Provisions are made as to the contents of the application, the action of the state engineer, publication of notice, protests, time for commencement and completion of work, etc., the making of proof and the filing of maps, etc., and provides that the priority of the appropriation shall be "determined by the date of receiving the written application in the state engineer's office" (section 1288x17), which in all respects, in substance, are similar to the provisions of the Wyoming and Idaho statutes. The Utah statute was considered by this court in the case of *Sowards* v. *Meagher,* 37 Utah, 212, 108 P. 1112, where the essential features of the statute are set forth, and the case of *Murray* v. *Tingley,* supra, and other cases therein cited, are approved, to the effect that a valid water right may be acquired even though there was no compliance with the statute regulating the appropriation of unappropriated waters, when the waters were actually diverted by means of a ditch or canal or other structure

and applied to a beneficial use before the inception of any adverse statutory claim. This court further, and in harmony with the case of *Nevada Ditch Co.* v. *Bennett*, 30 Or. 59, 45 P. 472, 60 Am. St. Rep. 777, stated that the three principal elements constituting a valid appropriation of water were: (1) An intent to apply the water to some beneficial use; (2) an actual diversion of it by means of a ditch, canal or other structure; and (3) an application of it to a beneficial use. This court then further stated:

"We think the filing of a written application with the state engineer, as required by the statute, is but declaring, or the giving of a notice of, an intention to appropriate unappropriated public water. The final step, and the most essential element, to constitute a completed valid appropriation of water, is the application of it to a beneficial purpose. Whatever else is required to be or is done, until the actual application of the water is made for a beneficial purpose, no valid appropriation has been effected. This was so before the statute, and it is still so under the statute. The filing of the application with the state engineer, as required by the statute, does not establish an appropriation of water. It but takes the place of, and is, the preliminary notice of intention to appropriate. Unless the construction of the works is commenced and completed within the time allowed by the engineer, and the water diverted and applied to the beneficial purpose of the proposed appropriation, the filing of the application is for naught, and no completed valid appropriation has been made."

Thus, this court, in such particular, considered the Utah statute in substance and effect to be the same as the statute of such other states regulating the appropriation of water, and gave it the same construction as did the courts of such other states.

In Long on Irrigation (2d Ed.) § 113, p. 195, the author says:

"With the development of the arid region and the increased demands made upon the water supply of the country with the increase of population, more attention has been paid to the regulation of the subject of the appropriation and use of water, and at present the subject is very largely regulated by statute, the statutory provisions being based essentially upon the doctrine of appropriation as developed by past experience.

"In a number of states, particularly under the recent irrigation codes, persons or corporations intending to appropriate water are

required to make application to the state engineer for a permit to make such appropriation, the application stating the particulars of the proposed appropriation. It is the duty of the engineer to pass upon such application and to grant a permit to make the appropriation in a proper case, but to refuse such permit where the appropriation would conflict with existing rights, or might be detrimental to the public interests. Where an appropriation is made under a permit from the state engineer, the priority of the appropriator dates from the filing of the application in the engineer's office.

"The statutes prescribe in detail the procedure to be followed in making the appropriation. Blank forms are prepared and furnished by the state engineer to be used in making application for a permit, giving notice of completion of works, application of water to a beneficial use, etc. The details vary more or less in the several states. Such provisions are in force in Idaho, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, South Dakota, Utah, and Wyoming. Wyoming was the first state to enact laws of this type, and the method of appropriation provided for is, for this reason, sometimes called the Wyoming system. The legislation of the other states has been largely modeled on that of Wyoming.

"With reference to the appropriation of water since the adoption of the recent legislation, the Supreme Court of Idaho recently said: 'Under the laws of this state there are two methods of acquiring water rights: One is to follow the statutory procedure and file an application for water with the state engineer, in which case there is a vested right which dates its inception from the time of filing the application with the state engineer. The other is to divert unappropriated water and apply it to a beneficial use without making application to the state engineer, which right dates from the application of the water to a beneficial use. The statutory method is the exclusive method by which the right can relate back to the filing of the application with the state engineer.'

"The statutory provisions do not substantially change the former law as to what constitutes a valid appropriation of water. The essentials of an appropriation, the intent, the actual diversion, and the application to beneficial use, are unaffected. And the filing of an application with the state engineer for a permit does not establish an appropriation, but merely takes the place of the posting of the notice previously required."

As is thus seen, the author, as to the proposition that the method prescribed by the statute to make an appropriation of water is not exclusive, does not place the Utah statute in a class different from that of Idaho, Wyoming, and other states, but in such respect makes no distinction.

Notwithstanding *Sowards* v. *Meagher*, decided in 1910, for 15 years unmodified by either judicial or legislative action, has stood as the correct construction of the statute, nevertheless, because of the words, ''and not otherwise,'' in the statute (which were in the statute when *Sowards* v. *Meagher* was decided), it now is urged that the statute is materially different from those of Idaho, Wyoming, and other states, and hence requires a different construction, and one that the method of making an appropriation prescribed by the state is exclusive, and that no valid appropriation may be made without a substantial compliance with the statute. Such a construction, as it seems to me, sticks too much in the bark, and does not go to the pith of the statute, and does not sufficiently regard the essentials, scope, and purpose of it. Certain it is, and as stated by Long, that these statutory provisions do not substantially change the law as to what constituted a valid appropriation, and that the essentials of an appropriation, the intent and the actual diversion and application of water to a beneficial use, are by these statutes unaffected. I think that just as true of the Utah statute as of the Idaho and Wyoming statutes. If the interpretation and construction of the Idaho and Wyoming statutes, that the scope and purpose of them are like those of the California statute, to preserve the evidence of water rights and title and to regulate the doctrine of relation back, are correct, as I think they are, then when the whole of the Utah statute and its general scope and purpose and its essentials are considered and found to be, as they are, similar to those of such other states, especially of Idaho and Wyoming, I think it follows that our statute requires the same construction and interpretation as is given such other statutes. In the interpretation and construction of statutes the primary rule, of course, is to ascertain and give effect to the intent of the Legislature, which intent and meaning must primarily be determined from the language of the statutes themselves; and in ascertaining such intent every word and phrase and each and every part of the act should be considered and given effect. But in doing so it is not proper to consider a word or

phrase in and of itself or disconnected from other parts of the act. That effect may be given to every part of the act in accordance with legislative intent, all the language of the act must be considered and brought into accord. For obvious reasons it is not proper or safe to base a construction upon a particular word or phrase. It is an established rule in the construction or interpretation of statutes that the intent of the Legislature is to be deduced from a view of the whole and every part of the statute taken and compared together. It also often happens that the true intent of the Legislature, though obvious, is not expressed by the language employed when that language is given merely its literal meaning. It is also another familiar rule that sometimes words ought to be and are made more subservient to the intent, not the intent to the words; and that statutes are not always expounded according to the letter but according to the meaning and intent of them. To give the statute the construction contended for I thus think too much importance is attached to the mere literal meaning of the words ''and not otherwise.'' When such words are considered with the whole statute I think they but mean that in making an appropriation and to avail one's self of the benefits and advantages afforded by the statute and of a relation back—a priority from the filing of the application for a permit—safeguarded and regulated by the statute, the method prescribed by it must be followed. If, however, one does not seek to so avail and protect himself, he, nevertheless, may make a valid appropriation by actual diversion and beneficial use without compliance with the statute, but in such case his priority will date only from actual diversion and beneficial use. Such seems to be the view entertained by the courts considering statutes of similar purport and having phrases and clauses of as much mandatory character of an exclusive method of appropriation as our statute. In such respects I think the statute here is no more mandatory or forbidding than is the statute of Idaho. The Utah statute says, the ''rights to the use of the unappropriated public water in the state may be acquired by appropriation, in the manner hereinafter provided, and not

otherwise.''   The Idaho statute, ''all rights to divert and use the waters of this state for beneficial purposes shall hereafter be acquired and confirmed under the provisions of this chapter.   And after the passage of this title all the waters of this state shall be controlled and administered in the manner herein provided.''   Both provide that any person, etc., thereafter to acquire a right to the use of any public waters ''shall, before the commencement'' of the construction of diverting works, ''make an application in writing to the state engineer for a permit,'' and contain similar provisions as to the contents of the application, the beginning and completion of the construction and diverting works, applying the waters to a beneficial use, the making of final proof and filing of maps, etc., which if done in accordance with the provisions of the statute, the priority of the appropriation is to date from ''the date of receiving the written application in the state engineer's office.''   From the provision of the Idaho statute that all rights to divert and use water ''shall hereafter be acquired and confirmed under the provisions of this chapter,'' and be controlled and administered in the manner therein provided, it may as well be argued that such necessarily implies that the right may not be acquired otherwise than as provided by the act, as to argue that because of the words ''and not otherwise'' in the Utah statute the method there prescribed is exclusive.

Nor is the Utah statute, as I think, more mandatory than the California or Montana statutes declaring that a person, etc., desiring to appropriate water ''must post a notice in writing'' and file a copy thereof for record, and that a failure to comply with the statute ''deprives the claimant of the right to the use of the water as against a subsequent claimant who complies therewith.''   I think such phrases in the California, Montana, Idaho, and Wyoming statutes are as forbidding and restrictive as the words ''and not otherwise'' in the Utah statute.

It seems clear to me that the essentials of an appropriation, and, as stated in *Sowards* v. *Meagher*, supra, are not changed or affected by the statute; that when those are com-

plied with before intervening rights a valid appropriation is made; that the general purpose of the statute, as stated by the courts, is to preserve the evidence of water rights and claims, provide a record of verified declarations of intention to appropriate water, protect an intending appropriator in, his initiatory steps, and to apply and regulate the doctrine of relation back, and that one may not avail himself of such advantage and protection unless the statute is substantially complied with. In this connection it must be observed that the engineer's proceedings are ex parte, and are neither in form nor in substance judicial in their nature (*Waha-Lewiston L. & W. Co.* v. *Lewiston-Sweetwater Irr. Co.* [C. C.] 158 F. 143); that the permit from the state engineer is of no avail against existing owners if it infringes their right (1 Wiel, § 410); that the permit when granted is granted subject to all existing and vested rights; and that the waters of the state are by the statute declared to be the property of the public, "subject to all existing rights to the use thereof."

The statute in question was passed in 1903. It may well be presumed that, since the adoption of the statute, and especially since the decision of *Sowards* v. *Meagher* in 1910 construing it, appropriators in reliance upon it have made appropriations of water by actual diversion and beneficial use without compliance with the statute, whose rights, if the construction of the statute contended for shall prevail, will be jeopardized, though for years they, at great expense by means of ditches, canals, and other structures, diverted and beneficially used waters and cultivated fields and orchards and built homes, by some one thereafter making an application to the state engineer seeking to claim such waters. I think such consequences ought to be avoided, and for reasons upon which the rule of *stare decisis* is founded it ought here to be applied; and, as an original proposition, no such construction should be given the statute as forbids or prevents the engineer, in such case, from denying an application or refusing a permit, or deprives the courts of power to protect and safeguard such acquired and vested rights.

Now, as to the merits of the cause as presented for review.

Choke Cherry creek, Pass Canyon creek, Little Pole creek, and Big Pole creek run from the mountains or foothills in a westerly or southwesterly direction to the ranch and townsite of the plaintiff. The creeks unite into one main channel before reaching the ranch. Along the creeks and before the union of them there are a number of springs referred to by the plaintiff as springs Nos. 1 to 12, both inclusive. All of them are tributary to and find their way into one or the other of the creeks and augment the waters coursing in them. For 20 years or more prior to any of the claimed rights of the defendant the predecessor of plaintiff had appropriated by actual diversion by means of ditches and canals and beneficially used all the waters of all the creeks, including the waters of the springs, to irrigate from 500 to 700 acres of lands upon which various crops were raised, and for live stock and townsite purposes. There is no dispute as to such diversion and continued use of all of such waters by the predecessor of the plaintiff up to the year 1910, a period of more than 13 or 14 years. Between 1908 and 1910 the predecessor of the plaintiff, to better conserve and utilize these waters, at an expense of about $75,000 constructed a sort of cement conduit or channel of rock and cement from near the ranch easterly towards the foothills a distance of about 4 miles. At the eastern end of the main conduit or channel a branch conduit was run towards the north and intercepted the waters coursing in Choke Cherry creek, Pass Canyon creek, and Little Pole creek, and a branch to the south to intercept the waters of Big Pole creek. Another branch was also extended from the main channel in a southerly direction to intercept and gather other waters to the south. The waters so intercepted from the creeks were thereafter, by means of the main channel, carried to plaintiff's ranch and there distributed and beneficially used from 1910 up to the commencement of this action and thereafter, except in high-water periods when from one third to a half of the waters of such creeks were coursed in the natural channels to plaintiff's ranch. The extensions or branches running to the north and south of the main channel are a considerable distance

east of the springs in question. It is the contention of the respondent that, after these cement channels or conduits were constructed and the waters of the creeks intercepted and carried through these conduits, none of the waters of the springs, all of which are situate to the north of the main conduit and west of the north extension conduit, found their way into any of the cement constructed conduits or channels, and because the waters by means of the cement conduits having been so taken out of the natural channels of the creeks above the springs, the flow of the natural channels of the creeks was so diminished that the waters from the springs finding their way into the natural channels below did not reach plaintiff's lands, but merely coursed down the natural channel for a distance of a mile or a mile and a half from plaintiff's ranch and there were lost; and hence all of such waters of such springs were abandoned by the plaintiff and its predecessor, and were not used by any one from 1910 until 1918, when the defendant claimed to have made appropriations of waters from sources of some of these springs. It was the contention of the plaintiff that none of such waters were abandoned by it or by its predecessor, and that after the construction of the cement conduits the waters of the springs through the natural channels still mingled with other waters coursing in the natural channels, especially in high-water periods, and so commingled with such other waters reached plaintiff's lands and were there beneficially used by it and its predecessor every year from 1910 to 1918 and thereafter.

In 1906 the predecessor of plaintiff filed an application with the state engineer to appropriate all the waters of the various creeks mentioned, and a certificate of appropriation was issued to it in 1916. All of these appropriations were made along the creeks but above the springs, and at or near the intersection of the cement conduits running to the north and south of the main conduit. The plaintiff's predecessor by such appropriation undoubtedly acquired all the waters of these creeks at and above such diversion points, but the claim is made, and I think rightly, that it thereby did not

acquire the waters which found their way into the natural channel below such diversion points, nor did the court award plaintiff any waters of the springs in virtue of such appropriation. In the fall of 1917 the predecessor of the plaintiff by deed conveyed to the plaintiff all rights, title, and interest in and to the lands, townsite, and waters, including the springs in question, which were owned or possessed by plaintiff's predecessor. In February, 1918, the respondent Hooppiania made a homestead entry of the S. E. $\frac{1}{4}$, the N. $\frac{1}{2}$ of the S. W. $\frac{1}{4}$, and the S. W. $\frac{1}{4}$ of the S. W.$\frac{1}{4}$ of section 25, township 3 south, range 8 west, and lot 3 in the N. W. $\frac{1}{4}$ of the N. W. $\frac{1}{4}$ of sec. 30, township 3 south, range 7 west. The main cement conduit of the plaintiff coursed through the north half of section 36, township 3 south, range 8 west and through the northwest quarter of section 31, township 3 south, range 7 west, section 36, lying immediately south of section 25. The natural channel of Big Pole creek coursed westerly, north of plaintiff's main conduit, through sections 31 and 36 and south of the south boundary line of the respondent's homestead. Respondent's cabin on his homestead is situate in the north half of the southeast quarter of section 25, and the lands claimed to have been cultivated and irrigated by him are situate west of his cabin and in the north half of the southwest quarter of section 25. East of his cabin about 60 feet are located the springs called by the plaintiff Nos. 1, 2, and 3, but which are called by the respondent the Conie springs. Springs 4, 5, and 6 are located on the respondent's homestead, but it is not claimed by him that he had appropriated any waters from these springs. Springs 7, 8, and 9 are located east of respondent's homestead and on the public domain. It is claimed by the respondent that he had appropriated the waters of spring No. 7, which he called the Wild Rose spring; but it is not claimed by him that he had made any appropriation of any of the waters of springs Nos. 8 and 9. Springs 10, 11, and 12 are located in the northwest quarter of section 31. The respondent does not claim to have appropriated any waters from spring No. 10. He does claim to have appropriated all the

waters of springs 11 and 12 which he calls the Holy Cross springs. Springs 11 and 12 are situate close to Big Pole creek, the largest of which is only about 12 feet from the center of the natural channel of the creek. The flow of the waters of springs 11 and 12 is about .33 of a second foot; of the Conie springs about .02 of a second foot, and of the Wild Rose spring about .033 of a second foot. Section 36, and section 31, upon which springs 10, 11, and 12 are located, are owned by the plaintiff.

The respondent claims and gave testimony to show that he, in the early part of March, 1918, made a dirt dam in the natural channel of Big Pole creek some distance west of the Holy Cross springs (or springs 11 and 12), and diverted the waters from the wash or natural channel into an old dirt ditch many years ago constructed by the predecessor of the plaintiff, and about 100 feet west of there made another dirt dam across the dirt ditch, and by means of a plow furrow ditch diverted the water from the old dirt ditch and coursed it in a northwesterly direction, as he testified, about 100 yards, and spread it on a patch of June grass of 2 or 3 acres on his homestead. He does not claim that up to April 25, 1918, he had made any further or other use of such waters. About the same time, in March, 1918, he testified, he ran a plow furrow ditch from spring No. 7, or Wild Rose spring, and carried the waters to his lands, and prior to April 25, 1918, irrigated about 5 acres of plowed lands which he had planted to vegetables just westerly of his cabin. About the same time, in March, 1918, he testified he constructed a small pipe line from springs 1, 2, ·and 3, or the Conie springs, situate about 60 feet easterly of his cabin, which waters were principally used by him for culinary purposes. On the 16th of April, 1918, the plaintiff, west of springs 11 and 12, or the Holy Cross springs, constructed a ditch from Big Pole creek to its main cement channel, and coursed the waters from springs 11 and 12 running in the natural channel into its main cement channel. Such diversion by the plaintiff was between the springs and where the respondent claims he made his diversion in March, 1918. The plaintiff's evidence

shows, and a number of witnesses testified thereto, that when it in April, 1918, so diverted the waters from Big Pole creek into its main cement channel, the respondent had not up to that time diverted or attempted to divert any waters from Big Pole creek or from springs 11 and 12, and that his diversion of waters out of Big Pole creek or from springs 11 and 12 were made after plaintiff's diversion. On April 25, 1918, the plaintiff without waiving any existing rights which it and its predecessor theretofore had acquired in and to the waters of the springs, filed an application with the state engineer to appropriate all the waters of the springs in question from No. 1 to No. 12, both inclusive, which included the springs the waters of which are claimed to have been appropriated by the respondent. On May 3, 1918, the respondent Hooppiania filed an application with the state engineer to appropriate all the waters of Holy Cross springs (springs Nos. 11 and 12), Wild Rose spring (spring No. 7), and Conie springs (springs Nos. 1, 2, and 3). The diversion dam made by the respondent was destroyed by the plaintiff and replaced by the respondent, and the diversion dam of the plaintiff destroyed by the respondent and replaced by the plaintiff, at different times. In June following, 1918, this lawsuit was commenced by plaintiff alleging a right in and to the use of all the waters of all the springs. The respondent counterclaimed, claiming a prior right to the use of all the waters of the Holy Cross, Wild Rose, and Conie springs. The trial was had in May, 1923. Between the commencement of the action and the trial, and after the filing of plaintiff's application with the state engineer in April, 1918, the respondent, in 1920 and 1921, abandoned his original diversion point of Big Pole creek and made another diversion point nearer the Holy Cross springs and above the diversion point made by the plaintiff in April, 1918, and from such diversion point constructed another ditch and connected it with the ditch claimed to have been constructed by him in March, 1918. Between the commencement of the action and the trial, the respondent broke up and irrigated more lands, and at the time of the trial had under cultivation about 22 acres for

which he claimed and was awarded a water right from the springs Holy Cross, Wild Rose, and Conie. The plaintiff, from the time of its application in April, 1918, until the day of the trial, kept its application alive. Up to the commencement of the action it was not claimed by the respondent that he had used any of the waters of the Holy Cross springs on any plowed or cultivated lands, or that he had made any use whatever of such waters except to spread them over a patch of June grass of about two or three acres which he testified were on his lands, but after the action was commenced and up to the years 1920 and 1922 he had carried some of the waters from the Holy Cross springs upon his cultivated lands lying westerly of his cabin. While the respondent in a portion of his testimony stated that the grasses upon which the waters of Holy Cross springs were first applied were wild timothy, yet, in other portions of his testimony he in effect admitted the grasses were only what is known as June grass, which, that time of year, was growing and generally grew all over sections of that country. The testimony of his witnesses as well as all other evidence in the case shows that the grasses were nothing but June grass which grows without water, but, as some of the witnesses testified, grows better with water; and it was shown, substantially without dispute, that June grass for hay or fodder has no feed or other property value, nor did the respondent at any time use any of the grass claimed to have been watered by him as hay or fodder. He testified the only use he made of such grass was: "I feed it to my stock." But it was not shown what stock he had or pastured on such grass in 1918, or at any time. He testified the land was not fenced, and that he kept sheep and cattle off it. I recognize that spreading water over and irrigating wild grass lands used for pasture or hay or both is applying water to a beneficial use. But to constitute such use requires something more than merely spreading water over a patch of June grass, without a further showing of pasturing it or otherwise making some substantial beneficial use of it. He and his witnesses testified that the ditch taken out by him from the channel of Big Pole creek and with

which the waters flowing from the Holy Cross springs were conveyed on this patch of grass land on his homestead was only 100 yards in length, and that it took the respondent and another only a couple of hours to construct it. But according to maps prepared by his surveyor and put in evidence by respondent and in accordance with his testimony that the diversion point of that ditch in March, 1918, was correctly represented on such maps, the distance from such diversion point to the south and nearest boundary line of plaintiff's lands was about 800 feet, and about 3,000 feet from his diversion point to his cabin and cultivated lands. If it be true that the ditch constructed by the respondent in March, 1918, was only 100 yards in length, as testified to by him and his witnesses, then none of the waters from springs 11 and 12 were conveyed on any part of plaintiff's lands prior to the filing of the application of the plaintiff in the state engineer's office in April, 1918; and if the respondent in March, 1918, and prior to the filing of such application of the plaintiff, diverted any of the waters of Holy Cross springs, he diverted and spread such waters on lands of the plaintiff, assuming, as testified to by him, that the ditch taken out by him in March, 1918, was only about 100 years in length. After this action was commenced the respondent undoubtedly diverted and by a new and an extension of his first ditch carried waters from these springs on his lands; but that, as against plaintiff's filing, cannot avail him.

The court found that during the years 1918 to 1921, both inclusive, the respondent broke up and tilled certain lands of his homestead, and in the year 1921 he had broken and tilled about 22 acres; that about the year 1920 he extended the ditch theretofore constructed by him, and during the irrigation season of 1921, by means of his ditch, conveyed all the waters of the Holy Cross springs and used them on his tilled lands in the growing of crops. The court thus awarded to the respondent all the waters of the Holy Cross springs from the 1st to the 15th of April, and from the 1st of July to the 1st of October of each year, and all the waters of the Conie springs (Nos. 1, 2, and 3), and of the Wild Rose spring

(No. 7), each year from the 1st of April to the 1st of October. For all other seasons of the year the waters of such springs were awarded to the plaintiff. All the waters of springs Nos. 4, 5, 6, 8, 9, and 10 were awarded to the plaintiff from the 1st of January to the 31st of December of each year. The waters so awarded to the respondent were awarded to him on the theory that whatever right, title or interest the plaintiff and its predecessors may theretofore have had in and to such waters were, prior to March, 1918, abandoned by the plaintiff and its predecessor; and that neither the plaintiff nor its predecessor had used any such waters for more than seven years prior to March, 1918, when the court found the respondent had diverted and beneficially used the waters so awarded to him. The court awarded the waters of the Holy Cross springs to the plaintiff during high-water periods on the theory that during such times the waters of such springs each year after 1910 and up to the time of the trial were continued to be commingled with other waters flowing in the natural channel of Big Pole creek and by such means, through the natural channel, were carried to plaintiff's lands and there beneficially used; but in periods other than high water, the court found that no waters of any substantial flow were carried in the natural channel of Big Pole creek, except what flowed in the creek from springs 11 and 12, and that such waters were not sufficient in volume or quantity to be carried, and were not carried, to plaintiff's lands, and hence in periods other than in high water were not used by it or its predecessor from 1910 to April, 1918.

Though it be assumed that the respondent in March, 1918, diverted, and by means of a ditch carried, waters of springs 11 and 12 from the natural channel of Big Pole creek, still the respondent was entitled only to so much water as he had actually diverted and beneficially used prior to and up to the filing of plaintiff's application in the state engineer's office April 25, 1918. At most, such quantity of water so diverted and used by him from such springs was only sufficient to irrigate between two and three acres of land. However, it is evident that the court awarding to the respondent all the waters

of springs 11 and 12 during the periods as was done did so by giving the respondent the benefit of the doctrine of relation back; that is, the court did not award to the respondent only the waters which he had actually diverted and beneficially used prior to and up to the time of the filing of plaintiff's application in the state engineer's office April 25, 1918, but awarded him waters from this source to irrigate lands for growing crops which he had broken up and tilled after the filing of plaintiff's application and after the commencement of this action. In that I think the court erred. The respondent's application in the state engineer's office not having been filed until after the plaintiff's application was filed, he was not, as against the plaintiff, entitled to the benefit of the doctrine of relation back.

But, with some hesitancy, I am constrained to go a step further. While the plaintiff testified that he, in March, 1918, diverted and by means of a ditch 100 yards in length carried waters of springs 11 and 12 on his lands, and there, that year, spread them over a patch of grass land of two or three acres—but made no further or other use of such waters during that year—still I think by the clear and manifest weight of all the evidence the respondent either made no diversion at all of such waters in March, 1918, and prior to the filing of plaintiff's application in April, 1918, or if he then diverted any of such waters, he merely spread them over lands of the plaintiff without its knowledge or consent and without any beneficial use to the respondent or to any one in privity with him. Under such view, and the respondent not being entitled to avail himself of the doctrine of relation back, he is not entitled to any of the waters of springs 11 or 12; and to such effect should the judgment be.

The situation as to springs 1, 2, 3, and 7 (the Conie and Wild Rose springs) is different. I think he is entitled to the waters of such springs as awarded him. Though prior to 1910 the predecessor of the plaintiff had diverted and beneficially used such waters, nevertheless, the great weight of the evidence shows that since that time and up to 1918 such waters were not used by the plaintiff or its predecessor nor

by any one, and hence in March, 1918, were subject to appropriation when the respondent diverted and by means of ditches and a pipeline, carried such waters to his lands and there beneficially used them prior to the filing of plaintiff's application in the state engineer's office in April, 1918.

As already stated, springs 4, 5, and 6 are on the homestead of the respondent. The waters of these springs were awarded to plaintiff; but the judgment in such particular is not assailed by the respondent. He only assails the judgment awarding the waters of the Holy Cross springs to the plaintiff from April 15 to July 1st, and from October 1st to April 1st. Hence, whether springs 4, 5, and 6, being on the respondent's April, 1918, involves a question not presented for review.

I therefore think the judgment should be modified as herein indicated, awarding the waters of springs 11 and 12 to the plaintiff, and of springs 1, 2, 3, and 7 to the respondent; the judgment awarding the waters of springs 4, 5, 6, 8, 9, and 10 to the plaintiff not being challenged should stand as rendered.

FRICK, J. I feel constrained to concur in the reasoning and conclusions of Mr. Justice STRAUP.

Chapter 67, Laws Utah 1919, is but a reenactment of the appropriation act adopted in 1903. Laws Utah 1903, c. 100. True, since then numerous amendments and changes have been made in the administrative provisions of the act. The purpose of the act as originally adopted has, however, been maintained throughout all of its changes. For example, the declaration that the water ''of all streams and other sources when it filed its application in the state engineer's office in in this state, whether flowing above or under ground, in homestead, were subject to appropriation by the plaintiff known or defined channels, is hereby declared.to be the property of the public, subject to all existing rights to the use thereof'' has, as we shall see, been continued in force in all of the re-enactments. See Laws Utah 1903, c. 100, where the declaration was first made. When chapter 100 was re-enacted in somewhat changed form in 1905, the declaration

was contained in section 47 of that act. Laws Utah 1905, c. 108. The same provision now constitutes section 1, chapter 67, Laws Utah 1919, which is the latest re-enactment of the original act adopted in 1903. In the original act, as well as in all the subsequent re-enactments, it is also provided:

"Rights to the use of any of the unappropriated water in the state may be acquired by appropriation, in the manner hereinafter provided, and not otherwise."

That provision is found in section 34 of chapter 100 aforesaid, and is also found in the same numbered section of chapter 108, Laws Utah 1905, and is now a part of section 41 of chapter 67, Laws Utah 1919, the latest re-enactment of the original act. In addition to the provision, which is found in the original act as well as in all of the re-enactments, that the right of the public to the water of this state is "subject to all existing rights to the use thereof," is also found this provision (Laws 1919, c. 67, § 48):

"Where there is no *unappropriated water* in the proposed source of supply, or where the proposed use will conflict with prior applications or *existing rights*, or where the approval of such application would in the opinion of the State Engineer interfere with the more beneficial use for irrigation, domestic or culinary purposes, stock watering, power or mining development, manufacturing, or would prove detrimental to the public welfare, it shall be the duty of the State Engineer to reject such application." (Italics mine.) Laws 1919.

The question therefore is, What is meant by "unappropriated water" and "existing rights?" In my judgment their meaning is neither ambiguous nor obscure. In view that the state cannot grant or permit the use of water except for some known and recognized beneficial use, it, by the same token, cannot take it from one who is applying it to a known and recognized beneficial use or purpose and give it to another. If, therefore, A makes application to the state engineer for permission to appropriate water he must make evident at least two facts: (1) That the water he seeks to appropriate is unappropriated; and (2) that he is not invading existing rights. If the water he seeks to appropriate is already being applied to a known and recognized beneficial use, or if, in the language of the statute, there are existing rights to the

water, then the state engineer cannot legally grant the application. True it is that the water may not come within the class of unappropriated water for two reasons: (1) Because there may be pending a prior application made pursuant to the provisions of the act; and (2) it may be actually applied to some known and recognized beneficial use. If a prior application under the act exists it is immaterial whether the water is then actually being applied to a beneficial use or not. The statute was enacted to authorize an applicant to acquire prospective rights to the use of water, and for the purpose of giving him ample time to perfect his proposed project or system whether it be intended for irrigation, for power, or for domestic purposes. An applicant may thus obtain an inchoate right to a large amount of water without applying it to a present beneficial use, and he has a right to apply the same from time to time to a beneficial use in small quantities until he has finally perfected his plant, system, or project, at which time he can apply all the water applied for to such beneficial use. His right to the water thus, by relation, dates back to the date of his application, and he is constantly protected to the same extent as though he had actually applied all of the water to a beneficial use from the date he first made his application. By complying with the statute, therefore, the applicant may obtain rights to a specific quantity of unappropriated water for future use without actually applying it to a present beneficial use.

In my judgment one may, however, also acquire rights to unappropriated water by diverting it from the stream or source by actually applying it to a beneficial use. In the latter case, however, the claimant can only acquire a right to such a quantity of water as he actually and visibly applies to a beneficial use, and his right becomes vested only from the time that the water is actually applied to a beneficial use. To hold otherwise is to disregard some of the provisions of the act as it now reads, and as it always has read. It would also lead to injustice, and, in some instances, to actual confiscation of property rights. One may easily imagine a case where a user may settle on lands at or near the mouth of one of

our numerous mountain canyons or streams, and there tap a small stream issuing from the canyon, or springs, with pipes and other devices, and make more or less extensive improvements by means of which he applies the water to culinary, domestic, and stock-raising purposes without having made an application under the act. In view that under such circumstances the user does not intend to protect any inchoate rights and immediately, openly and visibly applies all of the water to a beneficial use, it is not easy to understand why an application pursuant to the provisions of the act would be of any practical use except to make a record of the application and thus to obtain some official evidence of his rights. In view, however, that it is a sound legal proposition that in acquiring rights to property one is always charged with notice of what is open and visible to all, an applicant under the act must take notice that the water is being applied to a beneficial use, and hence is not then subject to appropriation under the act. If that be not so, then A, although he sees the water actually applied to a beneficial use, may, nevertheless, by complying with the act, obtain from the state engineer a certificate authorizing him to take water that is actually being applied to a beneficial use and therefore a lawful use. That such is the unavoidable result under the construction placed upon the act by the majority of the court, it seems to me, is beyond question. The state engineer would, in such a case, be powerless to protect the original user merely because the latter had failed to comply with the act although he is actually applying the water to the only use for which the state can control it.

Can it reasonably be contended that one who is actually, openly, and visibly applying water to a beneficial use has not acquired an ''existing right'' thereto which is protected by the act? Notwithstanding that, however, if no rights can be acquired except by complying with the act, then neither the state engineer nor the courts can prevent the confiscation of the first user's property rights by taking the water from him.

Nor, in my judgment, is the construction of the act contended for by the majority absolutely necessary. While it is quite true that if an applicant desires to acquire a prospective right to the use of water he can only acquire such right in one way, namely, by complying with the provisions of the act, he, as I view it, may nevertheless acquire a present (not a prospective) right to so much water as he actually, openly, and visibly applies to a beneficial use as against the whole world. There certainly can be no question that even after complying with the terms of the act the applicant's ultimate rights are limited to the quantity of water he actually applies to a beneficial use. It is therefore the actual use that gives the indefeasible right to the use of water and not the statutory application therefor. The right that is acquired by actual use is, in my judgment, just as sacredly protected by our statute as is the right acquired by making an application to the state engineer. The only difference between the two is that by pursuing the statute the applicant obtains an inchoate right to a specific quantity of water which he may apply to a beneficial purpose in the future; while under the other method no right can be acquired except to so much water as is actually, openly, and visibly applied to a present beneficial use.

Then again the question arises, What is meant by "existing rights?" Does it indicate only such rights as are acquired by complying with the act? If it be held that such is the case, something must be read into the statute which is not there. To so hold we must construe the statute as though it read "existing rights acquired under or by virtue of this act." The statute, however, is not thus restricted. It refers to existing rights generally, which means all rights that exist when the application to the state engineer is made. Moreover, if existing rights are assumed to be limited to rights existing at the time the act was originally adopted, then the provision is practically without effect. It certainly is without legal significance, since the Legislature was powerless to interfere with vested, that is, existing rights. The Legislature could, however, provide for and protect rights that may have

accrued after the passage of the act, and before application under the act could be made, and which would exist at the time the application under the act was actually made. That, in my opinion, is precisely what was intended and what is the true purpose of the act.

Again, water that is being applied to an actual, open, and visible beneficial use is no longer unappropriated water, and hence is not subject to appropriation. To hold otherwise is to hold that water may actually be applied to a beneficial use, the only use authorized by law, and yet belong to the unappropriated water of the state. That would be in the very teeth of the truth. It may be true that it was not appropriated in a particular way, but it is not true that in fact water which is acually applied to a beneficial use is unappropriated water under the law in force in this arid region. The language of the statute, however, settles that. It is there provided that if an application interferes "with the more beneficial use for irrigation, domestic or culinary purposes, stockwatering," etc., the application cannot prevail. Under the construction placed upon the statute by the majority, however, that provision can apply only in case the right to the uses which I have quoted is acquired pursuant to the statute "and not otherwise." These provisions, under the rule adopted by the majority, are therefore meaningless, for the reason that if the right to the uses specified was actually acquired pursuant to the statute it was needless to say anything about such a right, since it was indefeasible under the statute. If, however, the right was acquired by virtue of actual use without formal application, what is said in the statute is given full force and effect.

Much stress is, however, laid upon the fact that by making application through the state engineer a complete record is made by means of which legal certainty is established and controversies avoided. The fact is, however, that no certainty is or can be established by the record made in the engineer's office except that a particular applicant has made application for a specific quantity of water to be used at a particular place and for a specific purpose. The quantity of water that

will ultimately be applied to a beneficial use by the applicant, and of the use to which he obtains an indefeasible right under the statute, can only be determined by actual measurement of the quantity of water that he is actually applying to a beneficial use. The engineer's record and certificate may therefore show that the applicant is entitled to a much larger quantity of water than he is actually applying to a beneficial use, and may thus be entirely misleading. The test, and the only test, of the right to use water, as I have pointed out, is the quantity that is actually being applied to a beneficial use. That fact cannot be ascertained from the record in the engineer's office, nor from any record except from one that is the result of actual measurement. There is therefore no greater difficulty in ascertaining the truth in the one instance than in the other, and hence the argument concerning the sacredness of the record in the state engineer's office falls. That record is, however, important in protecting the rights of the applicant pending the time that he is perfecting his works or plant. To protect him in that regard and to make the time at which his rights attach, together with the quantity of water applied for and the place where it is to be used certain and uncontrovertible, is no doubt the principal purpose and utility of the statute. It was not intended to, nor should it be permitted to control the actual, open, and visible use of water that is being applied to a beneficial use.

In this connection it is also important to keep in mind that the act provides as follows:

"Beneficial use shall be the basis, the measure and the limit of all rights to the use of water in this state."

That "beneficial use" is the basis as well as the limit of all rights to use water is precisely what I contend for. Under the construction of the majority, however, it is not beneficial use that is the basis, but it is the application to the state engineer that constitutes the basis and beneficial use is merely the limit of the right. The majority base their whole contention upon the phrase "and not otherwise" to which I have hereinbefore referred. All, I think, will agree that it is a cardinal canon of construction that all words and phrases

must, if possible, be given effect. While it is true that words must be given their usual and ordinary meaning, it is equally true that there are many instances where particular words or phrases must be given a restricted or enlarged meaning so· as to harmonize all the provisions of a particular act and to give all of it proper effect. The majority of the court, as it seems to me, place undue importance upon the single phrase "and not otherwise." As I view it, that phrase can be given effect without destroying or silencing other important provisions of the act. When it is kept in mind that the principal purpose of the act is to provide safe, practical, and adequate means by which the water of this state may be appropriated before being actually, openly, and visibly applied to a beneficial use, and to protect the applicants in their efforts to apply the water to a future contemplated beneficial use, it is not difficult to understand the meaning of the phrase "and not otherwise." It merely means that the applicant can protect his inchoate right to a specific quantity of water in advance of actually, openly, and visibly applying it to a beneficial use by complying with the provisions of the act. In other words, the method provided in the act is the only method by which a right to the use of water without actually applying it to a present or immediate beneficial use can be initiated and adequately protected until such a time as the applicant shall be prepared to actually apply it to a beneficial use. Such a construction not only gives the phrase proper force and effect, but it also permits all other provisions of the act to which I have referred, and to many others to which I have not referred, to have full force and effect. The construction of the act I contend for leads to this: That every word and every phrase is given its appropriate effect; that the basis of the right to the use of the water of this state, just as the language of the act declares, is beneficial use; that every one who is actually, openly, and visibly applying water to a beneficial use is protected in his rights as against all other claimants who have no prior rights; that the means or method for ascertaining and determining the rights to the use of water of all persons who

openly and visibly are applying the same to a beneficial use is precisely the same whether they claim under the act or by virtue of actual beneficial use, namely, the measurement of the quantity of water that is actually, openly, and visibly applied to a beneficial use; and finally that each and every provision of the act is given proper force and effect. I most respectfully submit that such a result is not possible under the construction that the majority place on the act as I understand it.

I was a member of the court when the case of *Sowards* v. *Meagher*, 37 Utah, 212, 108 P. 1112, referred to in the dissenting opinion by Mr. Justice STRAUP, was decided. As I understand that case, and as I read Mr. Justice STRAUP'S dissenting opinion, that case and his opinion go to the extent that I have herein indicated, and no further. When the opinion in the Sowards Case was written I was of the opinion that the law was there properly reflected and applied, and by subsequent investigation and reflection the opinion I then formed has very materially been strengthened. I am of the opinion, therefore, that this case should be ruled as indicated in Mr. Justice STRAUP'S dissenting opinion.